proceedings, as is the case here. Accordingly, we award Friends of the San Juans and Westcott Bay Seafood Farms attorney fees upon compliance with RAP 18.1.

We hold that the Board properly denied the Association's request for a permit to build the dock; thus, we affirm.

ARMSTRONG, A.C.J., and SEINFELD, J., concur.

Review denied at 142 Wn.2d 1014 (2000).

[No. 41803-3-I.   Division One.   April 3, 2000.]
*In the Matter of the Personal Restraint of* TIMOTHY SCOTT HAYNES, *Petitioner.*

*Leta Jeanne Schattauer,* for petitioner.

*Christine O. Gregoire, Attorney General,* and *Donna H. Mullen, Assistant,* for respondent.

AGID, C.J. — Petitioner Timothy Haynes seeks relief from

his confinement for second degree assault, first degree rape, and two counts of first degree kidnapping. His grounds for relief focus primarily on a 1995 decision denying him parole, and the length of his confinement. For the reasons stated below, the petition is denied.

## FACTS

The Indeterminate Sentence Review Board (Board) described Haynes' offenses as follows:

> Count I of the Assault 2nd Degree conviction involves an incident in which a 17 year old female was walking [toward] a wooded area [when] she turned back and saw a man running towards her. She tried to run from [him], [and] tripped and fell down. He had a knife in his hand and grabbed her with that hand. He slashed at her with the knife and cut her left leg through her jeans. As she got up to run he cut the right side of her face with the knife. She ran to a nearby home and the woman at the home called police. She identified Mr. Haynes from a photo montage.

> Count III is a[n] incident [in which] a 23 year old female was forced into a vehicle by a man and driven to an area east of Woodinville. She had been walking from her apartment to check her mail and was en route back to her apartment. She observed a green vehicle stopped in the parking lot near her. The driver opened the passenger side door and pointed a handgun at her and ordered her into the car. She got into the car and they drove to the area of a lake where he continued to point the gun at her and told her that he intended to have sex with her. He parked the car in a wooded area and laid aside the gun, he then grabbed the woman. As he grabbed her the gun fell to the floor. She fought and escaped into the woods where she hid until daybreak and then walked home. She also identified Mr. Haynes in a lineup.

> Count IV is an incident [in which] a 14 year old girl was kidnapped from where she was counting papers at the Seattle Times drop box for the newspaper. She was alone and observed the green car as it went by. The driver parked in a driveway a couple of houses away and then drove back to where she was standing and parked in front of her. He asked for directions,

then grabbed her wrist and twisted it. He ordered her into the car and said he would kill her if she did not comply. He put her in the passenger seat and drove away. [After engaging in conversation, he dropped her back off where he had abducted her.]

[The] 1st Degree Rape incident occurred [when] Haynes saw a girl walking towards the end of the road [and] drove up the road and turned around. When he got to the girl he asked her for directions. He then got out of the car and grabbed her, throwing her into the car, threw a towel over her eyes, fondled her breasts, tied her hands with cords and drove away. He stopped the car on a dirt road and forced the girl to fellate him. After fondling her breasts and vagina he then released her.[1]

Haynes first became eligible for parole in March 1990. The Board found him not parolable, citing his lack of "specific sexual deviancy therapy," his escalation to the use of force and weapons, and his risk to the public. The Board concluded by stating "we have to say that we are not sure tha[t] any kind of sexual deviancy treatment would result in a finding of parolability at this particular time when we look at Mr. Haynes' commitment crimes." The Board reached essentially the same conclusions in parolability decisions made in 1991, 1992 and 1994.

In 1995, the Board acknowledged that Haynes had received counseling for sexual deviancy, but again found him not parolable. It emphasized Haynes' lack of formal and structured sexual deviancy treatment, as well as his "continual denial of two of [his] offenses." The Board also relied on evidence indicating that Haynes was a high risk to reoffend and had poor prospects for rehabilitation.

Haynes then filed this petition challenging the Board's 1995 parolability decision.

## DECISION

### I

■ Haynes initially contends the Board abused its

---

[1]"Decision and Reasons" for 1994 parolability determination, at 1-2 (paragraphs added).

discretion when it denied him parole in 1995.[2] Citing a regulation that lists some "adequate reasons" for denying parole, he argues that the evidence before the Board did not support denial of parole because none of the reasons listed in the regulation apply to his case.[3] But the reasons listed in the regulation are only *"[e]xamples* of adequate reasons for a finding of nonparolability . . . ."[4] Any fact or consideration demonstrating that an inmate is not "a fit subject for release" is sufficient.[5] Moreover, the Board is accorded a "high degree" of discretion in parole decisions.[6] As the court stated in *January v. Porter*, 75 Wn.2d 768, 774, 453 P.2d 876 (1969),

> although releasing a convicted felon on parole may be beneficent and rehabilitative and in the long run produce a genuine social benefit, it is also a risky business. The parole may turn loose upon society individuals of the most depraved, sadistic, cruel and ruthless character who may accept parole with no genuine resolve for rehabilitation nor to observe the laws and customs promulgated by the democratic society, which in the process of self-government granted the parole. Thus, recognizing the risky nature of parole as well as its

---

[2]Decisions of the Board are reviewed under an " 'abuse of discretion standard.' " *In re Personal Restraint of Ecklund*, 139 Wn.2d 166, 170, 985 P.2d 342 (1999).

[3]Former WAC 381-60-160 (1995) provided in part:

Examples of adequate reasons for a finding of nonparolability are:
(1) Active refusal to participate in available program or resources designed to assist an offender to reduce the risk of reoffense . . . .
(2) Serious and repetitive disciplinary infractions during incarceration.
(3) Evidence of an inmate's continuing intent or propensity to engage in illegal activity . . . .
(4) Statements or declarations by the inmate that he or she intends to reoffend or does not intend to comply with conditions of parole.
(5) Compelling evidence within a mental health, psychosocial, or psychological report that an inmate presents a substantial danger to the community if released. . . .

[4]Former WAC 381-60-160 (emphasis added).

[5]RCW 9.95.100.

[6]*Ecklund*, 139 Wn.2d at 174.

beneficent qualities, the courts have universally held that the granting or denial of parole . . . rests exclusively within the discretion of the board; that parole is not a right but a mere privilege conferred as an act of grace by the state through its own administrative agency.

In a similar vein, the United States Supreme Court has stated that

[t]he parole-release decision . . . depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release. . . . The parole determination . . . may be made "for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate." The decision turns on a "discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done."[7]

Applying these principles to the Board's 1995 decision denying Haynes parole, we cannot say that the Board abused its discretion.

■ A 1994 psychological report by Department of Corrections (DOC) psychologist William Jones stated that Haynes' risk for reoffense was "high" due to his existing track record and his lack of structured and formalized sexual deviancy treatment.[8] Jones described Haynes as a "purposeful and predatory sexual offender . . . ." A report from the prison "unit team" rated his prospects for rehabilitation as "poor." That prognosis was based in part on

---

[7]*Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 9-10, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979) (alterations in original) (citations omitted).

[8]Jones' opinion that a formal treatment program was necessary despite Haynes' individual counseling for sexual deviancy is an important factor. And while Haynes points out that Jones was unaware of some of Haynes' counseling when he prepared his report, Haynes' posthearing letter to the Board suggests that Jones did not alter his conclusions when informed of the additional counseling.

his lack of remorse when speaking to the unit team, and his refusal to admit guilt for two of his offenses. Although Haynes contends the Board could not consider his refusal to admit guilt, the Supreme Court recently rejected that argument, holding that the Board may give some weight to such evidence in making parolability decisions. Relying on its prior Fifth Amendment cases, the Court reasoned that so long as a denial of guilt would not subject an inmate to the risk of further criminal liability, there can be no violation of his right against self-incrimination.[9] It also concluded that, because there is a nexus between denying guilt and lack of rehabilitation, the Board could properly consider the denial. "[W]e agree with the Ninth Circuit's statement in *Gollaher* [*v. United States*, 419 F.2d 520, 530 (9th Cir. 1969)] that the first step toward rehabilitation is 'the offender's recognition that he was at fault.' "[10] Although Haynes presented evidence demonstrating commendable effort and progress toward rehabilitation, the Board was entitled to rely on this evidence to evaluate the advisability of releasing him.

Haynes contends the Board abused its discretion because he volunteered to undergo sex offender treatment in the community, and because the DOC psychologist stated his risk of reoffense would be only "moderate" if he underwent such treatment. But even a moderate risk of reoffense, together with the unit team's dim assessment of Haynes' prospects, would support the Board's conclusion that he is not a fit subject for release.

Haynes also points out that one of the "adequate reasons" for nonparolability listed in former WAC 381-60--160 is "[c]ompelling evidence" within a mental health report that an inmate presents a "substantial" danger to the community.[11] Even if we assume that this language set some sort of evidentiary threshold for parole denials based

[9]*Ecklund*, 139 Wn.2d at 172-73.

[10]*Ecklund*, 139 Wn.2d at 176.

[11]Former WAC 381-60-160(5) (1995).

on mental health evidence, the Board did have compelling evidence from experts and corrections personnel demonstrating that Haynes' release would pose a substantial danger to the community.

## II

■ Haynes also challenges the length of his confinement on the ground that it is clearly excessive. A term of confinement is clearly excessive only if it is shown to be "clearly unreasonable"—i.e., the result of discretion exercised on untenable grounds, or a result no reasonable person would have taken.[12] Haynes has not made that showing.

■ He first points out that his term of confinement currently exceeds the applicable standard range under the Sentencing Reform Act of 1981 (SRA). He argues that the Board lacked adequate reasons to extend his confinement beyond that range.[13] But a pre-SRA offender may be confined beyond the applicable SRA range if he is not rehabilitated or presents a danger to the public.[14] Indeed, the Board is statutorily required to continue the incarceration of any inmate who is not rehabilitated.[15] In its 1994 and 1995 parolability decisions, the Board in essence found that Haynes is not rehabilitated and still poses too great a risk to the public. Those reasons justify the exceptional minimum term.

■ Haynes also claims his term of confinement is exces-

---

[12]*State v. Ritchie*, 126 Wn.2d 388, 393, 894 P.2d 1308 (1995) (quoting *State v. Oxborrow*, 106 Wn.2d 525, 531, 723 P.2d 1123 (1986)); *In re Personal Restraint of Locklear*, 118 Wn.2d 409, 417, 823 P.2d 1078 (1992) ("clearly excessive" analysis applies to the exceptional minimum terms of pre-SRA offenders).

[13]The Board must give adequate written reasons for setting a minimum term that amounts to an exceptional sentence under the SRA. *Locklear*, 118 Wn.2d at 418; RCW 9.95.009(2).

[14]*Ecklund*, 139 Wn.2d at 176; *Locklear*, 118 Wn.2d at 412-15; *Addleman v. Board of Prison Terms*, 107 Wn.2d 503, 511, 730 P.2d 1327 (1986) (holding that examples of valid reasons for a decision by the Board to not conform with the SRA at parole hearings include "insufficient rehabilitation"); *In re Personal Restraint of George*, 52 Wn. App. 135, 758 P.2d 13 (1988).

[15]RCW 9.95.100; RCW 9.95.009(3).

sive because it is two and a half times longer than the applicable SRA range and exceeds the sentences imposed in other allegedly analogous cases. Our State Supreme Court has held, however, that such comparisons are not germane to the question of whether an exceptional sentence is excessive.[16] Instead, the test is whether the term of confinement is one that no reasonable person would impose or is so long that it "shocks the conscience" of the reviewing court.[17] Even in SRA cases, our courts have often held that a sentence of twice the top of the standard range is not clearly excessive.[18] Haynes' term of confinement does not violate the standard.

## III

■ Haynes next contends that the length of his confinement violates federal and state protections against cruel and unusual punishment. His analysis of this ground for relief is inadequate.[19]

■ ■ To be "cruel and unusual," punishment must be grossly disproportionate to the severity of the crime—i.e., " 'clearly arbitrary and shocking to the sense of justice.' "[20] Washington courts have traditionally considered four factors in addressing claims of cruel punishment: (1) the

[16]*Ritchie*, 126 Wn.2d at 396-97.

[17]*Ritchie*, 126 Wn.2d at 395-96 (quoting *State v. Ross*, 71 Wn. App. 556, 571, 861 P.2d 473, 883 P.2d 329 (1993)).

[18]*State v. Burkins*, 94 Wn. App. 677, 973 P.2d 15, *review denied*, 138 Wn.2d 1014 (1999) (sentence 3.5 times longer than upper end of the standard range); *State v. Smith*, 82 Wn. App. 153, 167, 916 P.2d 960 (1996) (sentence 3 times the top of the standard range); *State v. Overvold*, 64 Wn. App. 440, 450, 825 P.2d 729 (1992) (sentence 3 times the top of the standard range); *State v. Vaughn*, 83 Wn. App. 669, 680, 924 P.2d 27 (1996), *review denied*, 131 Wn.2d 1018 (1997) (sentence 2.5 times the top of the standard range).

[19]*See State v. Brune*, 45 Wn. App. 354, 363, 725 P.2d 454 (1986), *review denied*, 110 Wn.2d 1002 (1988) (to prevail in a personal restraint petition, a petitioner must support his or her claims with authority, references to the record, and persuasive reasoning).

[20]*State v. Farmer*, 116 Wn.2d 414, 433, 805 P.2d 200, 812 P.2d 858, 13 A.L.R.5TH 1070 (1991) (quoting *State v. Smith*, 93 Wn.2d 329, 344-45, 610 P.2d 869, *cert. denied*, 449 U.S. 873 (1980)).

nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction.[21] Haynes' analysis of these factors consists primarily of comparisons to the maximum standard range sentence for his offenses under the SRA, which he claims would be 96 months, and the 78-month minimum term set by the trial judge. This analysis completely ignores most of the relevant factors mentioned above and is insufficient to make out a case of cruel and unusual punishment.

## IV

Next, Haynes argues that because the Board's existence is perpetuated so long as pre-SRA inmates remain in the prison population, the Board members presiding over his parolability hearing had a conflict of interest that violated the appearance of fairness doctrine. He reasons that "[w]hen salary and the very existence of the [Board are] so closely connected to the number of prisoners remaining under the [Board's] jurisdiction, bias and/or prejudice exists; and the appearance of fairness in the [Board's] decisions does not exist." This reasoning is flawed in several respects.

First, so long as the maximum sentence has not expired, the Board retains jurisdiction over an inmate whether he is incarcerated or on parole.[22] Therefore, the Board's longevity is actually more closely tied to the maximum sentences of the remaining pre-SRA offenders than to their parole status. Hence, the Board has no pecuniary interest in parolability decisions.

Second, even if it could be said that the Board members' jobs were somehow linked to retaining an incarcerated population of pre-SRA offenders, that connec-

---

[21] *State v. Rivers*, 129 Wn.2d 697, 712-13, 921 P.2d 495 (1996).

[22] *In re Personal Restraint of Bible*, 69 Wn. App. 394, 845 P.2d 1336 (1992).

tion is far too attenuated to demonstrate a pecuniary interest in the outcome of any particular parolability hearing.[23] The test for an appearance of fairness violation is whether a reasonably prudent and disinterested observer would conclude that Haynes did not obtain a fair, impartial and neutral hearing.[24] A disinterested person could not reach that conclusion based on this evidence.

## V

Haynes next contends RCW 9.95.009(3) adversely and unconstitutionally affected his chances for parole. That statute states:

> Notwithstanding the provisions of subsection (2) of this section, the indeterminate sentence review board shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole.

He contends this statute, which did not exist at the time of his incarceration, violates the prohibition against ex post facto laws because it changes the criteria and/or priorities for parole decisions to his detriment. We disagree.

A law is ex post facto only if it disadvantages the person affected by it—i.e., it "alters the standard of punishment which existed under prior law."[25] The proponent of an ex post facto argument must "show with certainty that the sentence is harsher. The change in the law cannot

---

[23]A party asserting a violation of the doctrine must produce sufficient evidence demonstrating bias, such as personal or pecuniary interest on the part of the decision maker; mere speculation is not enough. *Bunko v. City of Puyallup Civil Serv. Comm'n*, 95 Wn. App. 495, 975 P.2d 1055 (1999); *Sherman v. Moloney*, 106 Wn.2d 873, 883-84, 725 P.2d 966 (1986).

[24]*See State v. Dominguez*, 81 Wn. App. 325, 914 P.2d 141 (1996).

[25]*State v. Ward*, 123 Wn.2d 488, 498, 869 P.2d 1062 (1994) (emphasis omitted).

result in mere speculation that the punishment is more severe."[26]

■■■ Here, Haynes has not demonstrated a disadvantage flowing from the challenged statute. The statute did not dictate any change in punishment for any crime. Nor did it create a new criterion for assessing parolability; on the contrary, public safety was already encompassed by the longstanding statutory requirement that the Board deny parole unless "rehabilitation has been complete and [the inmate] is a fit subject for release."[27] It is true that the statute at issue places particular emphasis on public safety, but the Board was free to emphasize that consideration under prior law and nothing in the record indicates that the new law brought about any change in the actual practice of the Board. Haynes' allegations of a disadvantage under RCW 9.95.009(3) are simply too speculative to support an ex post facto claim.[28]

## VI

■■■ Haynes also claims that the Board and DOC have wrongfully denied him access to the Sex Offender Treatment Program (SOTP). He admits he is on a waiting list for SOTP but contends his earliest possible admission to the program will occur after his last possible parolability hearing. He alleges the Board has refused to support his request for earlier admission into the program and asks this court "to order the DOC to immediately admit [him] into SOTP; and/or direct the [Board] to support Mr. Haynes' immediate admission into the program." But Haynes has not demonstrated any basis for this court to

---

[26]*In re Personal Restraint of Stanphill*, 134 Wn.2d 165, 173, 949 P.2d 365 (1998) (petitioner cannot prevail in ex post facto challenge without showing with certainty that the punishment is harsher).

[27]RCW 9.95.100.

[28]*See California Dep't of Corrections v. Morales*, 514 U.S. 499, 514, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995) (statute allowing decrease in frequency of parole hearings created only a "speculative and attenuated risk of increasing the measure of punishment" and thus did not violate ex post facto clause).

interfere in the business of the Board and DOC. He has not shown a violation of any Board rule, DOC regulation or statute and essentially concedes that he is being processed for SOTP admission in accordance with applicable admission criteria. Whether DOC and the Board choose to accelerate his admission into the program is a matter of administrative grace that is not reviewable by this court.

## VII

Haynes next argues that the International Covenant on Civil and Political Rights (ICCPR) entitles him to the benefit of any "lighter penalty" enacted after the commission of his offenses.[29] He contends the SRA prescribes lighter penalties for his offenses and argues that the ICCPR requires that his sentence be reduced to 96 months—the maximum standard range sentence available for his offenses under the SRA.[30]

Even assuming the ICCPR applies to Haynes,[31] his contention lacks merit. Haynes erroneously assumes he would have received a standard range sentence under the SRA. Although a standard range sentence would have been

---

[29]The United States became a party to the International Covenant on Civil and Political Rights (21 U.N. GAOR Supp. No. 16, at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171) on September 8, 1992. *See* 58 FED. REG. 45,934 (1993). Part IV, Article 15(1) of the treaty states:

No one shall be held guilty of any criminal offense on account of any act or omission which did not constitute a criminal offense, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time when the criminal [offense] was committed. *If, subsequent to the commission of the offense, provision is made by law for the imposition of a lighter penalty, the offender shall benefit thereby.*

(Emphasis added.)

[30]Because Haynes' sentences were ordered to run concurrently, the length of his sentence is equal to the longest of the concurrent sentences.

[31]There is authority holding that the ICCPR is not self-executing and therefore does not apply to the states. *White v. Paulsen*, 997 F. Supp. 1380 (E.D. Wash. 1998); *see also Ralk v. Lincoln County*, 81 F. Supp. 2d 1372 (S.D. Ga. 2000); *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244 (C.D. Calif. 1999); *Igartua De La Rosa v. United States*, 32 F.3d 8 (1st Cir. 1994), *cert. denied*, 514 U.S. 1049 (1995).

shorter than the minimum term set by the Board,[32] he could have received an exceptional sentence under the SRA that exceeded his minimum or maximum terms under the indeterminate scheme.[33] His court-imposed maximum sentence of 20 years under the indeterminate scheme was less than the life sentence available on the effective date of the SRA.[34] Hence, Haynes could have received a much longer sentence under the SRA than he received under the indeterminate scheme.

## VIII

Last, he contends the Board's 1995 decision denying him parole and extending his term to the maximum effectively denied him good time credits without a hearing. He argues that the Board's decision made him "forfeit all his good time already adopted by the ISRB, in violation of his due process rights." But as the Board correctly points out, the benefit of good time credits is a reduction in the inmate's minimum term and acceleration of his or her parole eligibility review date.[35] The record in this case demonstrates that Haynes has received the benefit of all good time credits earned to date and will receive an accelerated parolability hearing in September 2000 if he earns all available good time.

The petition is denied.

KENNEDY and BECKER, JJ., concur.

---

[32]After considering the SRA guideline ranges, the Board set a minimum term of 120 months.

[33]We note that the Board in fact recited several aggravating factors when it redetermined his minimum terms in light of SRA guidelines.

[34]See former RCW 9A.40.020 and RCW 9A.20.021(a) (1983).

[35]In re Personal Restraint of Cashaw, 68 Wn. App. 112, 117-18, 839 P.2d 332 (1992), aff'd, 123 Wn.2d 138, 866 P.2d 8 (1994).